IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| JAMES CAMEL | ) | CASE NO.: |
| 713 Georgetown Avenue | ) | |
| Elyria, Ohio 44035 | ) | JUDGE |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **PLAINTIFF'S COMPLAINT FOR** |
| JAMES AIR CARGO, INC. | ) | **DAMAGES AND REINSTATEMENT** |
| 6519 Eastland Road, Suite 6 | ) | |
| Cleveland, Ohio 44142 | ) | **JURY DEMAND ENDORSED** |
| | ) | **HEREIN** |
| **Serve also:** | ) | |
| JAMES THOMAS GOFF, | ) | |
| Statutory Agent | ) | |
| 1055 Concord Drive | ) | |
| Medina, Ohio 44256 | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff, James Camel, by and through undersigned counsel, files his Complaint against

Defendant and states and avers the following:

**PARTIES, JURISDICTION, AND VENUE**

1.    Camel is a resident of the city of Elyria, county of Lorain, state of Ohio.

2.    James Air Cargo, Inc. ("JAC") is a domestic corporation for profit that has its principal place of

business at 6519 Eastland Road, Suite 6.

3.    Within 300 days of the conduct alleged below, Camel filed a Charge of Discrimination with the

Equal Employment Opportunity Commission ("EEOC"), Charge No. 532-2020-01594 against

JAC.

4.    On May 19, 2021, the EEOC issued and mailed a Notice of Right to Sue letter to Camel

regarding the Charges of Discrimination brought by Camel against JAC in EEOC Agency

Charge No. 532-2020-01594.

1

EXHIBIT A

5.    Camel received his Right to Sue letter from the EEOC in accordance with 42 U.S.C. § 2000e-5(f)(1), which has been attached hereto as Plaintiff's Exhibit A.

6.    Camel has filed this Complaint within 90 days of the issuance of the Notice of Right to Sue letter.

7.    Camel has properly exhausted his administrative remedies pursuant to 29 C.F.R. § 1614.407(b).

8.    All material events alleged in this Complaint occurred in county of Cuyahoga.

9.    Therefore, personal jurisdiction is proper over Defendants pursuant to Ohio Revised Code § 2307.382(A)(1) and (4).

10.   Venue is proper pursuant to Civ. R. 3(C)(3) and (6).

11.   This Court is a court of general jurisdiction over the claims presented herein, including all subject matters of this Complaint.

## FACTS

12.   Camel is a former employee of JAC.

13.   Camel began working for JAC on or about May 8, 2019.

14.   Camel worked for JAC as a Driver.

15.   Camel is African American.

16.   In or around August 2019, JAC hired Chris Last Name Unknown (LNU) to work as a Dispatcher.

17.   Chris LNU is Caucasian.

18.   In or around August 2019, the buckle on Camel's pants broke while Camel was working. ("August 2019 Broken Belt Incident")

19.   During the August 2019 Broken Belt Incident, Camel asked Chris LNU if he had or knew someone who had a spare belt for Camel to wear because Camel's pants sagged without a belt.

20. During the August 2019 Broken Belt Incident, Chris LNU told Camel that Camel should be used to having saggy pants because Camel is "from the hood." ("August 2019 From-The-Hood Comment")

21. In making the August 2019 From-The-Hood Comment, Chris LNU was referencing a fashion trend of urban cultures that involves wearing pants, usually jeans, that sag below the waistline.

22. Chris LNU made the August 2019 From-The-Hood Comment because of Camel's race.

23. JAC has a policy against harassment and discrimination in the workplace. ("Discrimination Policy")

24. It is a violation of JAC's Discrimination Policy for a Caucasian employee to describe an African American coworker as being "from the hood."

25. Alternatively, it is not a violation of JAC's Discrimination Policy for a Caucasian employee to describe an African American coworker as being "from the hood."

26. The August 2019 From-The-Hood Comment was because of race.

27. The August 2019 From-The-Hood Comment was unwanted by Camel.

28. Camel opposed the August 2019 From-The-Hood Comment.

29. Camel was embarrassed by the August 2019 From-The-Hood Comment.

30. Camel was offended by the August 2019 From-The-Hood Comment.

31. In response to the August 2019 From-The-Hood Comment, Camel reported Chris LNU to Joe Vidmar for making the August 2019 From-The-Hood Comment. ("August 2019 Discrimination Report")

32. Vidmar was at all times hereinafter mentioned an individual who was a manager and/or supervisor at JAC who acted directly or indirectly in the interest of JAC.

33. Vidmar is Caucasian.

34. Based on JAC's policies, the August 2019 Discrimination Report was considered a significant workplace event.

35. JAC has a policy of investigating significant workplace events.

36. An investigation should include interviewing the complainant.

37. An investigation should include interviewing the subject of the complaint.

38. An investigation should include interviewing the subject of the reported discrimination.

39. An investigation should include interviewing witnesses to the reported discrimination.

40. An investigation should include getting a written statement from the complainant.

41. An investigation should include getting a written statement from the subject of the complaint.

42. An investigation should include getting a written statement from the subject of the reported discrimination.

43. In response to the August 2019 Discrimination Report, JAC did not interview Camel.

44. In response to the August 2019 Discrimination Report, JAC did not interview Chris LNU.

45. In response to the August 2019 Discrimination Report, JAC did not interview any employee.

46. In response to the August 2019 Discrimination Report, JAC did not get a written statement from Camel.

47. In response to the August 2019 Discrimination Report, JAC did not get a written statement from Chris LNU.

48. In response to the August 2019 Discrimination Report, JAC did not get a written statement from any employee.

49. In response to the August 2019 Discrimination Report, JAC conducted no investigation whatsoever.

50. By failing to investigate the August 2019 Discrimination Report, JAC ratified Chris LNU's conduct.

51. By failing to investigate the August 2019 Discrimination Report, JAC allowed Chris LNU's conduct to continue.

52. Failing to investigate a report of workplace harassment and/or discrimination is an adverse action.

53. Failing to investigate a report of workplace harassment and/or discrimination is an adverse employment action.

54. JAC willfully failed to investigate the August 2019 Discrimination Report.

55. JAC intentionally failed to investigate the August 2019 Discrimination Report.

56. In response to the August 2019 Discrimination Report, Vidmar told Camel that Chris LNU did not mean any offense in making the August 2019 From-The-Hood-Comment.

57. Following the August 2019 Discrimination Report, Chris LNU continued making racist comments to Camel.

58. Throughout Camel's employment, Chris LNU frequently addressed Camel and another African American employee, Eric White, by calling them "Boy." ("Calling African American Coworkers 'Boy'")

59. The term "Boy," when used in reference to African American persons, is a racial slur that has historical ties to slavery and is used to demean African American men.

60. Throughout Camel's employment for JAC, Camel was an adult.

61. Camel was not a child during his employment for JAC.

62. Eric White was not a child during his employment for JAC.

63. Chris LNU's Calling African American Coworkers "Boy" was done in a racially demeaning way.

64. Chris LNU's Calling African American Coworkers "Boy" was done because of race.

65. Chris LNU's Calling African American Coworkers "Boy" constitutes the use of racial slurs.

66. JAC's Discrimination Policy prohibits the use of racial slurs.

67. Alternatively, JAC's Discrimination Policy allows the use of racial slurs.

68. Chris LNU's Calling African American Coworkers "Boy" was because of race.

69. Chris LNU's Calling African American Coworkers "Boy" was unwanted by Camel.

70. Camel opposed Chris LNU's Calling African American Coworkers "Boy".

71. Camel was embarrassed by Chris LNU's Calling African American Coworkers "Boy".

72. Camel was offended by Chris LNU's Calling African American Coworkers "Boy".

73. A reasonable person would consider Chris LNU's Calling African American Coworkers "Boy" to be severe and/or pervasive.

74. Chris LNU's Calling African American Coworkers "Boy" constituted racial harassment.

75. Chris LNU's Calling African American Coworkers "Boy" created and/or maintained a racially hostile work environment.

76. Chris LNU's Calling African American Coworkers "Boy" was intentional.

77. Chris LNU's Calling African American Coworkers "Boy" was willful.

78. As a Dispatcher, Chris LNU was able to dictate to which addresses JAC's drivers, like Camel, would perform deliveries.

79. Chris LNU would send Camel on deliveries to neighborhoods that have high crime rates. ("Racially Patterned Work Location Assignments")

80. Chris LNU performed the Racially Patterned Work Location Assignments because of Camel's race.

81. In response to Camel's opposing the Racially Patterned Work Location Assignments, Chris LNU told Camel that Camel should have no problems performing deliveries because Camel was "from the hood."

82. The Racially Patterned Work Location Assignments were unwanted by Camel.

83. Camel opposed the Racially Patterned Work Location Assignments.

84. Camel was embarrassed by the Racially Patterned Work Location Assignments.

85. Camel was offended by the Racially Patterned Work Location Assignments.

86. A reasonable person would consider the Racially Patterned Work Location Assignments to be severe and/or pervasive.

87. The Racially Patterned Work Location Assignments constituted racial harassment.

88. The Racially Patterned Work Location Assignments created and/or maintained a racially hostile work environment.

89. The Racially Patterned Work Location Assignments are evidence of racial animus. *See, e.g.*, *Williams v. Consol. Edison Corp. of N.Y.*, 255 Fed.Appx. 546, 549 (2d Cir.2007).

90. The Racially Patterned Work Location Assignments were an adverse action.

91. The Racially Patterned Work Location Assignments were an adverse employment action.

92. The Racially Patterned Work Location Assignments constitute discrimination on the basis of race.

93. The Racially Patterned Work Location Assignments were done willfully.

94. The Racially Patterned Work Location Assignments were done intentionally.

95. JAC knew about the Racially Patterned Work Location Assignments.

96. JAC's Discrimination Policy prohibits a Caucasian dispatcher from sending African American drivers on more-dangerous deliveries because of the African American drivers' race.

97. Alternatively, JAC's Discrimination Policy allows a Caucasian dispatcher to send African American drivers on more-dangerous deliveries because of the African American drivers' race.

98. Based on JAC's policies, the Racially Patterned Work Location Assignments were considered a significant workplace event.

99.  In response to the Racially Patterned Work Location Assignments, JAC did not interview Camel.

100. In response to the Racially Patterned Work Location Assignments, JAC did not interview Chris LNU.

101. In response to the Racially Patterned Work Location Assignments, JAC did not interview any employee.

102. In response to the Racially Patterned Work Location Assignments, JAC did not get a written statement from Camel.

103. In response to the Racially Patterned Work Location Assignments, JAC did not get a written statement from Chris LNU.

104. In response to the Racially Patterned Work Location Assignments, JAC did not get a written statement from any employee.

105. In response to the Racially Patterned Work Location Assignments, JAC conducted no investigation whatsoever.

106. By failing to investigate the Racially Patterned Work Location Assignments, JAC ratified Chris LNU's conduct.

107. By failing to investigate the Racially Patterned Work Location Assignments, JAC allowed Chris LNU's conduct to continue.

108. Failing to investigate behavior that displays a racial animus is an adverse action.

109. Failing to investigate behavior that displays a racial animus is an adverse employment action.

110. JAC willfully failed to investigate the Racially Patterned Work Location Assignments.

111. JAC intentionally failed to investigate the Racially Patterned Work Location Assignments.

112. JAC did not require similarly situated Caucasian employees to conduct deliveries in dangerous neighborhoods with the same or similar frequency as JAC required for its African American drivers.

113. Requiring African American employees to undertake more dangerous tasks than similarly situated Caucasian employees is an adverse action.

114. Requiring African American employees to undertake more dangerous tasks than similarly situated Caucasian employees is an adverse employment action.

115. In ratifying the Racially Patterned Work Location Assignments, JAC required its African American employees to undertake more dangerous tasks than similarly situated Caucasian employees.

116. In allowing the Racially Patterned Work Location Assignments, JAC treated African American employees less favorably than similarly situated Caucasian employees.

117. The Racially Patterned Work Location Assignments constitute discrimination on the basis of race.

118. JAC willfully allowed the Racially Patterned Work Location Assignments to continue.

119. JAC intentionally allowed the Racially Patterned Work Location Assignments.

120. In or around October 2019, Chris LNU learned that Camel's wife is Caucasian.

121. In or around October 2019, after learning that Camel's wife is Caucasian, Chris LNU looked at Camel with disgust and said, "You people sure do love our women." ("October 2019 You-People Comment")

122. Chris LNU made the October 2019 You-People Comment because of Camel's race.

123. In making the October 2019 You-People Comment, Chris LNU used "You people" to refer to African Americans as being separate from Caucasians.

124. In making the October 2019 You-People Comment, Chris LNU was implying that there was a problem with interracial marriage.

125. In making the October 2019 You-People Comment, Chris LNU implicitly signaled his endorsement of anti-miscegenation laws.

126. The October 2019 You-People Comment was unwanted by Camel.

127. Camel opposed the October 2019 You-People Comment.

128. Camel was embarrassed by the October 2019 You-People Comment.

129. Camel was offended by the October 2019 You-People Comment.

130. A reasonable person would consider the October 2019 You-People Comment to be severe and/or pervasive.

131. The October 2019 You-People Comment constituted racial harassment.

132. The October 2019 You-People Comment created and/or maintained a racially hostile work environment.

133. The October 2019 You-People Comment was intentional.

134. The October 2019 You-People Comment was willful.

135. Following the October 2019 You-People Comment, Chris LNU learned that Camel has five children.

136. Upon learning that Camel has five children, Chris LNU told Camel that "having that many kids is a Black thing." ("October 2019 Racist Comments About Camel's Children")

137. The October 2019 Racist Comments About Camel's Children also included Chris LNU's mentioning that he was "surprised" Camel supported his children.

138. In making the October 2019 Racist Comments About Camel's Children, Chris LNU stated that "most black men do not take care of their kids."

139. Chris LNU made the October 2019 Racist Comments About Camel's Children because of Camel's race.

140. Chris LNU made the October 2019 Racist Comments About Camel's Children based on racist stereotypes of African American men.

141. The October 2019 Racist Comments About Camel's Children were because of race.

142. The October 2019 Racist Comments About Camel's Children were unwanted by Camel.

143. Camel opposed the October 2019 Racist Comments About Camel's Children.

144. Camel was embarrassed by the October 2019 Racist Comments About Camel's Children.

145. Camel was offended by the October 2019 Racist Comments About Camel's Children.

146. A reasonable person would consider the October 2019 Racist Comments About Camel's Children to be severe and/or pervasive.

147. The October 2019 Racist Comments About Camel's Children constituted racial harassment.

148. The October 2019 Racist Comments About Camel's Children created and/or maintained a racially hostile work environment.

149. The October 2019 Racist Comments About Camel's Children were intentional.

150. The October 2019 Racist Comments About Camel's Children were willful.

151. In or around November 2019, Chris LNU made comments about Camel's wearing jewelry—a necklace and his wedding ring—to work. ("November 2019 Derogatory Comments About Jewelry")

152. The November 2019 Derogatory Comments About Jewelry included Chris LNU's stating that Chris LNU was unsure how "someone like [Camel]" could afford jewelry.

153. The November 2019 Derogatory Comments About Jewelry include Chris LNU's stating that "wearing jewelry like [Camel] is just a Black thing."

154. The November 2019 Derogatory Comments About Jewelry were because of race.

155. The November 2019 Derogatory Comments About Jewelry were unwanted by Camel.

156. Camel opposed the November 2019 Derogatory Comments About Jewelry.

157. Camel was embarrassed by the November 2019 Derogatory Comments About Jewelry.

158. Camel was offended by the November 2019 Derogatory Comments About Jewelry.

159. A reasonable person would consider the November 2019 Derogatory Comments About Jewelry to be severe and/or pervasive.

160. The November 2019 Derogatory Comments About Jewelry constituted racial harassment.

161. The November 2019 Derogatory Comments About Jewelry created and/or maintained a racially hostile work environment.

162. The November 2019 Derogatory Comments About Jewelry were intentional.

163. The November 2019 Derogatory Comments About Jewelry were willful.

164. In or around late November 2019, Chris LNU made derogatory comments about Hispanic persons. ("November 2019 Comments About Hispanic Employees")

165. One of Camel's children is Hispanic.

166. The November 2019 Comments About Hispanic Employees included Chris LNU's stating that JAC should just give Hispanic employees "Coronas," in reference to the Mexican beer, and the Hispanic employees "will all work for free!"

167. The November 2019 Comments About Hispanic Employees were because of race.

168. The November 2019 Comments About Hispanic Employees were unwanted by Camel.

169. Camel opposed the November 2019 Comments About Hispanic Employees.

170. Camel was embarrassed by the November 2019 Comments About Hispanic Employees.

171. Camel was offended by the November 2019 Comments About Hispanic Employees.

172. A reasonable person would consider the November 2019 Comments About Hispanic Employees to be severe and/or pervasive.

173. The November 2019 Comments About Hispanic Employees constituted racial harassment.

174. The November 2019 Comments About Hispanic Employees created and/or maintained a racially hostile work environment.

175. The November 2019 Comments About Hispanic Employees were intentional.

176. The November 2019 Comments About Hispanic Employees were willful.

177. On or about November 29, 2019, Camel reported Chris LNU's racist behavior to John Mangan. ("November 29, 2019 Discrimination Report")

178. Mangan was at all times hereinafter mentioned an individual who was a manager and/or supervisor at JAC who acted directly or indirectly in the interest of JAC.

179. Mangan is Caucasian.

180. The November 29, 2019 Discrimination Report included Camel's reporting Chris LNU's Calling African American Coworkers "Boy."

181. The November 29, 2019 Discrimination Report included Camel's reporting Chris LNU's Racially Patterned Work Location Assignments.

182. The November 29, 2019 Discrimination Report included Camel's reporting Chris LNU's October 2019 You-People Comment.

183. The November 29, 2019 Discrimination Report included Camel's reporting Chris LNU's October 2019 Racist Comments About Camel's Children.

184. The November 29, 2019 Discrimination Report included Camel's reporting Chris LNU's November 2019 Derogatory Comments About Jewelry.

185. The November 29, 2019 Discrimination Report included Camel's reporting Chris LNU's November 2019 Comments About Hispanic Employees.

186. In making the November 29, 2019 Discrimination Report, Camel was opposing unlawful discrimination on the basis of race.

187.  Based on JAC's policies, the November 29, 2019 Discrimination Report was considered a significant workplace event.

188.  In response to the November 29, 2019 Discrimination Report, Mangan rolled his eyes and shrugged his shoulders to convey that he was annoyed with Camel's decision to report Chris LNU.

189.  In response to the November 29, 2019 Discrimination Report, Mangan's behavior conveyed that Mangan would not take seriously Camel's report of workplace discrimination and harassment.

190.  During the November 29, 2019 Discrimination Report, Camel began writing a written complaint on an office form prepared by JAC.

191.  Upon realizing that Camel was making a written complaint during the November 29, 2019 Discrimination Report, Mangan became angry and tried snatching the written form from Camel while asking, "Where did [Camel] even get that complaint form from?!" ("November 29, 2019 Angry Outburst in Response to Camel's Protected Complaint")

192.  The November 29, 2019 Angry Outburst in Response to Camel's Protected Complaint was in response to Camel opposing discrimination on the basis of race.

193.  In performing the November 29, 2019 Angry Outburst in Response to Camel's Protected Complaint, Mangan made it less likely for a reasonable employee to oppose discrimination on the basis of race.

194.  The November 29, 2019 Angry Outburst in Response to Camel's Protected Complaint was an adverse action.

195.  The November 29, 2019 Angry Outburst in Response to Camel's Protected Complaint was an adverse employment action.

196. The November 29, 2019 Angry Outburst in Response to Camel's Protected Complaint constitutes retaliation.

197. In making the November 29, 2019 Angry Outburst in Response to Camel's Protected Complaint, Mangan was tacitly admitting that JAC would not investigate Chris LNU's conduct.

198. In making the November 29, 2019 Angry Outburst in Response to Camel's Protected Complaint, Mangan was tacitly admitting that JAC condoned Chris LNU's conduct.

199. JAC conducted no investigation in response to the November 29, 2019 Discrimination Report.

200. JAC willfully failed to investigate the November 29, 2019 Discrimination Report.

201. JAC intentionally failed to investigate the November 29, 2019 Discrimination Report.

202. Based on Mangan's conduct during the November 29, 2019 Discrimination Report, Camel realized that JAC would not correct any of the ongoing racist behavior of Chris LNU and that Camel would continue to be subjected to racist behavior while working at JAC.

203. No reasonable person could be expected to endure months of consistent racial comments and use of racial slurs by a coworker.

204. No reasonable person could be expected to endure his or her employer's decision to allow and condone racist behavior in the workplace.

205. No reasonable person could be expected to endure the hostile work environment sustained and created by JAC.

206. On or about November 29, 2019, Camel was constructively discharged by JAC.

207. The above facts show that JAC engaged in a pattern and practice of unlawful discrimination on the basis of race.

208. The above facts show that JAC engaged in a pattern and practice of unlawful retaliation.

209. As a result of JAC's unlawful conduct, Camel has suffered and will continue to suffer damages.

## COUNT I: RACE DISCRIMINATION—HOSTILE WORK ENVIRONMENT

210. Camel restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

211. As an African American, Camel is a member of a statutorily protected class under 42 U.S.C. §§ 2000e *et seq.*

212. Throughout his employment, Camel was subjected to unwanted, severe, and persistent racial comments, including the use of demeaning racial slurs, racial stereotyping, and racially motivated behaviors.

213. JAC knew about the racial harassment that Camel was facing, but did not take corrective measures and refused to conduct any investigation or issue discipline.

214. As a result of the racial harassment that JAC allowed, condoned, and ratified, Camel was subjected to a hostile work environment amounting to race discrimination in violation of 42 U.S.C. §§ 2000e *et seq.*

215. As a result of JAC's discrimination against Camel in violation of 42 U.S.C. §§ 2000e *et seq.*, Camel has been denied employment opportunities providing substantial compensation and benefits, thereby entitling Camel to injunctive, equitable, and compensatory monetary relief.

216. As a result of JAC's discrimination against Camel in violation of 42 U.S.C. §§ 2000e *et seq.*, Camel has suffered mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain suffering.

217. In their discriminatory actions as alleged above, JAC's acted with malice or reckless indifference to the rights of Camel, thereby entitling Camel to an award of punitive damages.

218. To remedy the violations of the rights of JAC's secured by 42 U.S.C. §§ 2000e *et seq.*, Camel requests that the Court award him the relief demanded below.

## COUNT II: RACE DISCRIMINATION

219. Camel restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

220. As an African American, Camel is a member of a statutorily protected class under 42 U.S.C. §§ 2000e *et seq.*

221. Throughout his employment, Camel was treated less favorably than similarly situated Caucasian employees.

222. JAC's discriminatory behaviors, as alleged above, amount to unlawful discrimination on the basis of race in violation of 42 U.S.C. §§ 2000e *et seq.*

223. As a result of JAC's discrimination against Camel in violation of 42 U.S.C. §§ 2000e *et seq.*, Camel has been denied employment opportunities providing substantial compensation and benefits, thereby entitling Camel to injunctive, equitable, and compensatory monetary relief.

224. As a result of JAC's discrimination against Camel in violation of 42 U.S.C. §§ 2000e *et seq.*, Camel has suffered mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain suffering.

225. In its discriminatory actions as alleged above, JAC's acted with malice or reckless indifference to the rights of Camel, thereby entitling Camel to an award of punitive damages.

226. To remedy the violations of the rights of JAC's secured by 42 U.S.C. §§ 2000e *et seq.*, Camel requests that the Court award him the relief demanded below.

## COUNT III: RETALIATION IN VIOLATION OF TITLE VII

227. Camel restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

228. As an African American, Camel is a member of a statutorily protected class under 42 U.S.C. §§ 2000e *et seq.*

229. 42 U.S.C. § 2000e-3(a) makes it "an unlawful employment practice for an employer to discriminate against *** any individual *** because he has opposed any practice made an unlawful employment practice by this subchapter."

230. During his employment, Camel opposed the unlawful racial discrimination that he and his coworkers faced.

231. In response to Camel's opposition to the unlawful employment practices as described above, JAC took adverse actions and adverse employment actions against Camel.

232. As a result of JAC's taking adverse actions and adverse employment actions against Camel based on Camel's opposition to unlawful employment practices, JAC violated 42 U.S.C. § 2000e-3(a).

233. As a result of JAC's discrimination against Camel in violation of 42 U.S.C. § 2000e-3(a), Camel has been denied employment opportunities providing substantial compensation and benefits, thereby entitling Camel to injunctive, equitable, and compensatory monetary relief.

234. As a result of JAC's discrimination against Camel in violation of 42 U.S.C. § 2000e-3(a), Camel has suffered mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain suffering.

235. In its discriminatory actions as alleged above, JAC's acted with malice or reckless indifference to the rights of Camel, thereby entitling Camel to an award of punitive damages.

236. To remedy the violations of the rights of JAC's secured by 42 U.S.C. § 2000e-3(a), Camel requests that the Court award him the relief demanded below.

18

## DEMAND FOR RELIEF

WHEREFORE, Camel demands from Defendants the following:

(a) Issue an order requiring JAC to restore Camel to one of the positions to which he was entitled by virtue of his application and qualifications, and expunge his personnel file of all negative documentation;

(b) An award against JAC of compensatory and monetary damages to compensate Camel for physical injury, physical sickness, lost wages, emotional distress, and other consequential damages, in an amount in excess of $25,000 per claim to be proven at trial;

(c) An award of punitive damages against JAC in an amount in excess of $25,000;

(d) An award of reasonable attorneys' fees and non-taxable costs for Camel claims as allowable under law;

(e) An award of the taxable costs of this action; and

(f) An award of such other relief as this Court may deem necessary and proper.

Respectfully submitted,

Brian D. Spitz (0068816)
THE SPITZ LAW FIRM, LLC
25200 Chagrin Boulevard, Suite 200
Beachwood, OH 44122
Phone: (216) 291-4744
Fax:   (216) 291-5744
Email:  brian.spitz@spitzlawfirm.com

*Attorney For Plaintiff James Camel*

## JURY DEMAND

Plaintiff James Camel demands a trial by jury by the maximum number of jurors permitted.

Brian D. Spitz (0068816)

EEOC Form 161 (11/2020)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: | James Camel<br>713 Georgetown Avenue<br>Elyria, OH 44035 | From: | Cleveland Field Office<br>EEOC, AJC Fed Bldg<br>1240 E 9th St, Ste 3001<br>Cleveland, OH 44199 |

☐ On behalf of person(s) aggrieved whose identity is
*CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
| --- | --- | --- |
| 532-2020-01594 | Maria M. Colon, Investigator | (216) 306-1129 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒ The EEOC issues the following determination: The EEOC will not proceed further with its investigation, and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other *(briefly state)*

## - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

*Dana R. Hutter* (signature)

**Dana R. Hutter,**
**Deputy Director**

May 19, 2021

*(Date Issued)*

Enclosures(s)

cc: | Joe Vidmar<br>Vice President<br>JAMES AIR CARGO INC<br>6519 Eastland Road<br>Cleveland, OH 44142 | Nicole Riggins<br>THE SPITZ LAW FIRM<br>25200 Chagrin Blvd - Suite 200<br>Beachwood, OH 44122 |

Enclosure with EEOC
Form 161 (11/2020)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court <u>under Federal law</u>.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS    --    Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date **you** *receive* this **Notice**.  Therefore, you should keep a **record of this date**.  Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost.  If you intend to consult an attorney, you should do so promptly.  Give your attorney a copy of this Notice, and its envelope or record of receipt, and tell him or her the date you received it.  Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was** *issued* **to you** (as indicated where the Notice is signed) or the date of the postmark or record of receipt, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction.  (Usually, the appropriate State court is the general civil trial court.)  Whether you file in Federal or State court is a matter for you to decide after talking to your attorney.  Filing this Notice is not enough.  You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief.  Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge.  Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office.  If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS    --    Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.  For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 -- not 12/1/10 -- in order to recover unpaid wages due for July 2008.  This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above.  Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION    --    Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer.  Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney).  Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE    --    All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case.  If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice).  While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case.  Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice**.  (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

**SUMMONS IN A CIVIL ACTION    COURT OF COMMON PLEAS, CUYAHOGA COUNTY JUSTICE CENTER**

| CASE NO. | | SUMMONS NO. |
|---|---|---|
| CV21950824 | D1 CM | 45093625 |

(27 of 44)  (PAGE 44)

Rule 4 (B) Ohio

Rules of Civil Procedure

|  | |
|---|---|
| JAMES CAMEL | **PLAINTIFF** |
| **VS** | |
| JAMES AIR CARGO, INC. | **DEFENDANT** |

# SUMMONS

JAMES AIR CARGO, INC.
6519 EASTLAND RD., SUITE 6
CLEVELAND OH 44142

**Said answer is required to be served on:**



Plaintiff's Attorney

BRIAN D SPITZ
25200 CHAGRIN BOULEVARD, SUITE 200

BEACHWOOD, OH 44122-0000

**You have been named defendant in a sums complaint (copy attached hereto) filed in Cuyahoga County Court of Common Pleas, Cuyahoga County Justice Center, Cleveland, Ohio 44113, by the plaintiff named herein.**

**You are hereby summoned and required to answer the complaint within 28 days after service of this summons upon you, exclusive of the day of service.**

**Said answer is required to be served on Plaintiff's Attorney (Address denoted by arrow at left.)**

**Your answer must also be filed with the court within 3 days after service of said answer on plaintiff's attorney.**

**If you fail to do so, judgment by default will be rendered against you for the relief demanded in the complaint.**

**Case has been assigned to Judge:**

CASSANDRA COLLIER-WILLIAMS
**Do not contact judge. Judge's name is given for attorney's reference only.**



**NAILAH K. BYRD**
Clerk of the Court of Common Pleas

| DATE SENT |
|---|
| Aug 4, 2021 |

By 

Deputy

COMPLAINT FILED    08/03/2021

CMSN130

# SUMMONS IN A CIVIL ACTION    COURT OF COMMON PLEAS, CUYAHOGA COUNTY JUSTICE CENTER

| CASE NO. | | SUMMONS NO. |
|---|---|---|
| CV21950824 | D1 CM | 45093626 |

(27701 AND4500 44F13)

Rule 4 (B) Ohio

Rules of Civil
Procedure

|  |  |
|---|---|
| JAMES CAMEL | **PLAINTIFF** |
| **VS** | |
| JAMES AIR CARGO, INC. | **DEFENDANT** |

## SUMMONS

JAMES AIR CARGO, INC.
JAMES THOMAS GOFF, STATUTORY AGENT
1055 CONCORD DRIVE
MEDINA OH 44256-0000

**You have been named defendant in a sums complaint (copy attached hereto) filed in Cuyahoga County Court of Common Pleas, Cuyahoga County Justice Center, Cleveland, Ohio 44113, by the plaintiff named herein.**

**Said answer is required to be served on:**



**You are hereby summoned and required to answer the complaint within 28 days after service of this summons upon you, exclusive of the day of service.**

**Said answer is required to be served on Plaintiff's Attorney (Address denoted by arrow at left.)**

Plaintiff's Attorney

BRIAN D SPITZ
25200 CHAGRIN BOULEVARD, SUITE 200

BEACHWOOD, OH 44122-0000

**Your answer must also be filed with the court within 3 days after service of said answer on plaintiff's attorney.**

**If you fail to do so, judgment by default will be rendered against you for the relief demanded in the complaint.**

**Case has been assigned to Judge:**

CASSANDRA COLLIER-WILLIAMS
**Do not contact judge. Judge's name is given for attorney's reference only.**



**NAILAH K. BYRD**
Clerk of the Court of Common Pleas

| DATE SENT |
|---|
| Aug 4, 2021 |

By
**Deputy**

COMPLAINT FILED    08/03/2021

CMSN130